The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention. For the court is now sitting. God save the United States and this honorable court. Good morning, counsel, and welcome. We're pleased to be hearing argument in the first case with Nelson v. Mac Warner. Ms. C, would you like to proceed? Thank you, Your Honor, and may it please the court. Just last year, five federal courts rejected challenges to ballot order statutes very similar to West Virginia's, and this case should not be the outlier. Because unlike those of West Virginia, West Virginia has a stronger reason to reach the same resolve. It already rejected a ballot order statute challenge five years ago, holding in no uncertain terms that any benefit from a candidate appearing higher on a ballot is, quote, not a constitutional concern. In light of the Supreme Court's decision in Rucho, that holding is enough to dispense with this case on jurisdictional grounds. But in any event, that holding makes clear that appellees cannot prevail on the merits either. So turning first to the jurisdictional issues, how West Virginia benefits from any first-place position on a ballot is a political question, not a judicial one. Appellees raised two primary arguments in their brief why Rucho shouldn't apply to this context. They argued first that this case is a really bad... Excuse me, just one minute, Ms. C. You just finished telling us that seven courts had ruled within the last year or two on these ballot order statutes. So how many of those said that they were not a political question? Most of the courts addressed them on the merits. Did they not? Respectfully, Your Honor, they did not. Only one of the courts in the recent batch of these cases in the past year and a half reached the merits. That was the Eighth Circuit's decision in Pavek. And that decision was on a stay posture where there was only a question of a likelihood of success on the merits. And there, the court's jurisdictional analysis was extremely short. It was a couple of sentences on standing, a couple of sentences on political question, where the only reference to the Rucho decision was a CF citation, which suggests that even the Eighth Circuit knew there was some tension. The history of ballot order cases, there are numerous cases in which the courts have addressed the merits. Why does Rucho change that? Because that was a gerrymandering case. There's certainly a history of those cases, but that was also true for partisan gerrymandering cases. Rucho makes clear there were decades of partisan gerrymandering. So when we have courts who have looked at these issues, they've really struggled to address these issues in the typical Anderson verdict framework, because this sort of positional bias question, it's not really talking about the right to vote at all. This is not a typical vote dilution claim, where the claim is that someone's vote isn't being counted equally. This court actually rejected that argument in the Elkhorn decision, because there the court said that every vote that is cast, even on an irrational basis, such as who's listed first on a ballot, is still a legitimate vote. And this court said, who are we to demean those choices? So this isn't a typical case. Excuse me, that's your argument on the merits. You're just standing. And those district court, I mean, those opinions you were referring to in the last year and a half were district court decisions, except for the Eighth Circuit decision. So it troubles me that courts have had a history of addressing ballot order statutes. And why should we depart from that? What in the language of Rousseau says that we have to do that? Yes, Your Honor. And first, just to clarify, they're not just district court decisions. The 11th Circuit's decision in Jacobson addressed this issue on the merits and went through the history and went through the Rousseau analysis. But the reason that Rousseau applies here is because this is a question where we have to know what is the constitutional baseline here? What counts as fair? And this is what makes this sort of partisan case different from a voting rights case. In a typical vote dilution case, the constitutional default is zero restrictions. So if the severity of a burden from a state law is, say, 2.94%, we know that's the burden. But that's not true here, because what Rousseau makes clear is there is no constitutional right to a process that has no partisan decision making at all. And we don't, the Constitution actually tolerates even highly partisan processes. So that's the problem here. Let me follow up with one question then. What if your statute, the West Virginia statute, said that if a candidate appeared in boldface type, I mean, the winner of the last election instead of the ballot order, whoever won the election in 2020, the candidates were entitled to appear in boldface type on the ballot if they were in the same party as the winner of the presidential election in West Virginia. You're saying that Rousseau would prohibit a court from looking at that? Not necessarily, Your Honor. I don't think Rousseau would address that question because we wouldn't have the partisan considerations there. That's the unique factor that Rousseau was focused on, because we don't know from the Constitution how much partisan consideration is appropriate. This isn't a case where we start from the default that you can't have any burden or any burden on, perhaps, a candidate's ability to participate or compete. For better or for worse, our constitutional system tolerates some partisan considerations. Well, we do have the precedent in this circuit of a case on point to Alcon case. And how do we deal with that case? I know it was for Rousseau, but we didn't have any difficulty in getting to that case. Well, Your Honor, of course, it was before Rousseau. And I do respect that the court reached the merits. And the state certainly agrees that the court would like to reach on the merits. But we agree on that. So having agreed on that, when we look at Rousseau, and I'm fairly familiar with the Rousseau case, the plaintiffs here aren't asking us to allegate the primacy effect vote fairly. What they're asking us is a fair chance to be at the top of the ballot. And whether you consider the harm to be de minimis or not, it is actually documented there is a significant difference. And the type of plaintiffs you have here indicated a specific type of harm that affects them in terms of not being at the top of the ballot. It's not a question of the primacy vote being fair, which the court has maybe in Rousseau determined to be political. We don't have that at all here. Well, Your Honor, respectfully, we do because if the basis the state is using is a partisan basis, then we have to know how much partisan consideration is appropriate. And that's what makes it a political question, because the Constitution doesn't answer that. But when we turn to the merits, even if we look at this as a merits issue, and we look at the severity of the crime here. So we're now moving to the merits? You're moving away from that issue into the merits now? You want to deal with that? And are we going to deal with it in an innocent verdict framework? Your Honor, I'm happy to move to the merits unless the court has brought up merits. And maybe you're confusing me. Maybe I didn't quite understand you. I thought we were dealing with this whole question of jurisdiction and just disability. My apologies, Your Honor. I thought your question talking about the severity of the burden was moving into the merits. So I'm happy to discuss that point. If we look at the severity of the burden, the Alcourt decision is also squarely on point here, because Alcourt also dealt with the ballot order statute. And Alcourt held that the issues raised there, the same right to vote and equal protection claims, did not raise a constitutional concern. And Alcourt said that any burdens there were, at most, most minimal. It compared other U.S. Supreme Court cases and said, in comparison to those, these are mere squabbles that are, quote, almost inconsequential. So we simply don't have a case where we have a severe burden. Now, the distinction the Vista Court drew is that there was different evidence here that tried to quantify how great the primacy effect is in these races. But that's something that Alcourt also forecloses. Alcourt was an appeal after granting a motion to dismiss. And some of the arguments plaintiffs raised was that if they'd only had the opportunity for discovery, they could have introduced evidence that gave a precise quantification of the degree of harm. Was that actually the holding in Alcourt, or was that dicta? Well, Your Honor, what this court did hold is that that was legally irrelevant. So the court rejected that precise claim that more evidence would have been necessary because the court said that empirical analysis into the degree of harm is, quote, not necessary to our analysis. So we're going to agree that at least in Alcourt, we did apply the Constitution and Henderson verdict test. So is that where we're going with this? You seem to be walking down that path by using Alcourt as a basis here. Well, certainly, Your Honor, the point I'm only making is that if the court wants to proceed to the merits, we believe that Alcourt squarely decides this case. But the fact that Alcourt- The question of wanting to proceed with the merits, the question is whether or not we should. And we have to because of the jurisdictional concerns you raised, we find distinguishable from the Rootsville case, a partisan gerrymandering case. And here you have a different situation altogether in terms of the type of harm that's being indicated. One, you've got a very discernible instance in which it is shown there is a very big difference of being at the top and bottom. And here individuals, plus the organizational group that speaks on behalf of many individuals, they say that harm is affecting them and that it affects the constitutional rights. So if we get to the merits of it, the question I brought to you then is how do we proceed? You brought up Alcon, and that used the constitutional test of Henderson verdict. Is that where we are? If the court proceeds to the merits, then yes, we agree that the Anderson verdict test would be appropriate. And the first stage of Anderson verdict is to weigh the severity of the burden. And here we know from Alcorn that that burden is most minimal. That's the language this court used. It called it almost inconsequential. And the only distinction in this case is that perhaps there was better evidence to quantify how great it is. But that is something that Alcorn says is simply legally irrelevant. So that evidence doesn't make a difference in this case. But even if we take the district court at its own terms and move to the next stage of what standard would apply here, as we've briefed, we think that the district court erred by creating a third test in Anderson verdict. There's the deferential standard on one hand, strict scrutiny on the other, and the district court invented this considerable magnitude test. As we brief, we think that that is legally incorrect. But this court doesn't need to reach that. Because on the district court's own terms, the court would first have to find that there is a burden of considerable magnitude here. And Alcorn doesn't allow that conclusion. Because even if this court rejects Alcorn's decision about degree of harm being unnecessary and holds that this is somewhat different than the case in Alcorn, we still have the hurdles of the U.S. Supreme Court's decision in Monroe and verdict. Those cases involved access to the ballot or the ability to have write-in votes. And the Supreme Court said even in those case, there were not substantial burdens. And one was, quote, a very limited burden. So if Alcorn starts on one far end of the scale in terms of burden, even assuming that we are a little bit further in this case, in order to get to the district court, we would have to leap over the U.S. Supreme Court cases to get to very limited and then somehow get all the way over to considerable magnitude. With respect to... Well, when we are dealing with this case, one thing is clear. This is not Alcorn. Alcorn, there are some serious distinctions between this case and Alcorn. Alcorn dealt with major versus minor parties, for instance. The statute entrenches a single majority party, this particular statute. And then within the tiers of Alcorn, the order was randomly assigned. It's a different case altogether, what we're dealing with here, is it not? No, it's not, Your Honor. First, the statute doesn't entrench any party. This isn't like the Graves decision out of Oklahoma, where the statute said one party was always listed first. This is a statute that gives same criteria that applies to all parties. And over the course of the 30-year history, it has benefited both parties. But with the major and minor party distinction, there's nothing in Alcorn that suggests that that was relevant to the court's reasoning. That was actually the issue before the court. So let me understand that. If something is unconstitutional, the fact that it shifts from one party to another party over a course of time makes it constitutional? Well, Your Honor, I'm certainly not conceding that it's unconstitutional. I understand that. I gave you the hypothetical because it seems to go in that direction, that it doesn't matter if it is unconstitutional. It can be cured if it goes from, if it's shown, it can go from one party to the next party. Your Honor, that's not my argument. I was only bringing that up to show that this is not a case of entrenchment. This isn't an example, for instance, as if a state had a hundred-year history of always voting for one party. And then there might be reason to say that a facially neutral statute like ours might be entrenchment of a political party. But the key distinction with Alcorn that Acolyte's raised is this major... Let me ask you, let me ask you further, because I think this is key. Well, let me give you another hypothetical, but that I think is relevant here. That is, could West Virginia pass a statute that said, for instance, in any given election, Republican candidates will be given an eight to 10 chance to win an extra 3% on a total vote? Your Honor, we do not agree that would be constitutional because then that would be clearly saying that one party in particular would get that. But that's not this statute, and here's why. This statute... But it is the effect of this statute. It is the effect of it in terms of how it actually is applied and what happens. Your Honor, it is a necessary result that some party has to be listed first. So some party is always going to have the primacy effect, taking plaintiff's evidence at face value. So the question is, what is the process the state uses to make that unavoidable decision? And here we have a neutral process that looks towards past election results. This court in Alcorn actually said that there is merit to using that method because at least it has the benefit of showing that the state's decision has the support for individuals in the state itself. So what language in Alcorn are you referring to that? Because as I read Alcorn, Alcorn's saying that there's a state interest in reducing voter confusion by keeping the parties that get more than 10% of the vote in the top of the ballot. And also it has the advantage of maintaining party order symmetry across many different offices on the ballot. Alcorn doesn't seem to treat the major political parties differently. It did not, Your Honor. But this court's analysis at Alcorn says that there is no constitutional concern at all. It was about the type of injury at stake, not who's hurt by it. If the major-minor party distinction was relevant, we would have expected Alcorn to say that, or we would have expected any of the other two-tier ballot cases that apparently cite to reference that. And they're simply silent on that question because that's not what mattered for Alcorn. What mattered for Alcorn is that this is an injury that is not a constitutional concern, and at the very most, is a most minimal burden. So even under Anderson's verdict, it survives constitutional review. Thank you, Your Honor. Just speak briefly, if you will, to this court recently in the Batten v. McAllister case, a case I'm sure you're familiar with. It was South Carolina's win-or-take-all method of electoral college. We said it was justiciable, and that case came after Rucho, and it also dealt with questions of political process. If we could hear that claim, why can't we hear this? Of course, Your Honor. It's not West Virginia's position that any claim of political process is itself a political question. It didn't have the same partisan element, where a partisan basis was the basis for decision in that case. It's also different because there, there was both a long history of adjudicating those claims and very clear Supreme Court precedent how to do it. And I think the last distinction, and that involved an ordinary case of vote dilution, where we do have clear constitutional standards. But again, that's not this case because in order to make this a vote dilution claim, this court would have to say that the votes that are cast based on who was listed first in the ballot are somehow less meaningful and less legitimate than votes cast for other reasons. Thank you. Okay, Ms. Sia, you're into your rebuttal time now. So I will move on to Mr. Magistro, if you'd like to proceed, sir. Thank you, Your Honor. May it please the Court. My name is Anthony Magistro, and I'm here representing Dakota Nelson, West Virginia Democratic Party, and the West Virginia House Democratic Leadership Committee. I think the first place I'd like to start in this is to emphasize the factual record that was before the district court. Because the factual record and the factual findings of that, that court established, all established an injury that, that goes throughout all three of the appellant's arguments. Start and speak with it in terms of jurisdiction and disability, and then intertwine your facts with it. Okay, well, let's, I mean, what the first issue we're going to have to deal with right up front, which is what your opposing counsel did. You know, I think that, that Your Honor got it right when you referenced that, and the Supreme Court has been clear, was clear in Ruccio that it was the exception. We had 50 years of courts successfully adjudicating ballot order decisions. And, and, and, and, you know, even every other attempt by, by courts to do, to deal with the redistricting have, have, have failed. That's what the, when those cases get up to the Supreme Court, the Supreme Court struggles with finding a standard. There is no struggle to find a standard here, because the standard is Anderson-Burdick. You look at the burden, you look at the state's reasons for the burden, and you see whether the, whether you, and you, you balance the burden against the, the, the state's interests. That is the kind of test, as the Eighth Circuit said, indicated in Paddock. The reason the Eighth Circuit didn't have to have an, have a long discussion of, of justiciability, because it's obvious. They had a, those distinguish this case significantly from, from Ruccio. Well, what is it, what is it that you would want the court to do, assuming there's even an injury here? What is it that, that you want us to do? I think... Or the court at all? Well, the court, the court, what the court did is the court very succinctly ordered the, the, an injunction that put, that stopped the enforcement of this statute. The court said, it's not my job to decide which of a number of constitutional... Right. In fact, the court said that it, the district court said, and you conceded, I think, that the court cannot order the state to adopt a particular order or method in its ballot process. So, how is any perceived injury even redressable? It, the, the perceived, the injury is selection of ballot order, which get, gives the other party a 5.88% advantage on a discriminatory part... Well, who won, who won Mr. Nelson's election? Who won the, who was the top vote getter in the election, in the, for the candidacy Nelson ran for? I, he, Mr. Nelson finished last and was listed last on the... No, no, but my question is, who finished first in that race? Was Mr. Hornbuckle a Democrat, right? Right. That, that is true. And, and we're not... So, then how does that, what does that do to your injury argument? The injury is the advantage that the other party gets. There's no guarantee that you the discriminatory... Well, you started talking about facts and the fact appears to be here, that at least the top vote getter was a Democrat. So, that Democrat was not injured in the very election that Mr. Nelson ran in. We have never, we have never argued that, that ballot order is, is outcome determinative. And it doesn't have to be. Okay. I meant, that's what I thought I heard you saying. Yeah, it doesn't, it, it, what it does is in a significant number of races, it is outcome determinative. The record in this case established, and we've lifted them in the brief, numerous elections where the margin of victory was less than the 5.88%. That is, that, that we, that the primacy effect gives the Republican... Mr. Registro, what if Joseph Biden had won West Virginia in 2020? What would be your injury standing in court today? Well, he didn't. So, for the next election... This is hypothetical. The statute, I mean, I think as Judge Wynn explained, the statute's still unconstitutional because it's, it selects, the selection is based on partisan criteria. But the badge that said that's getting to the merits, isn't it? I think Judge Keenan was asking about your injury. Well, there would be no, I don't think there would be an injury to the Democrats in, for the next four years. However, that didn't happen. We were going to have two more elections. And, you know, as Ms. C said, she said, this isn't a, this is a case where this, the statute's gone back and forth. As Judge Chambers... Speaking of upcoming elections, is Mr. Nelson running, currently running for anything? The filing period doesn't begin until January. However... So why isn't this moot now? Because the other, because we certainly will have Democratic candidates and Democratic House candidates that are going to run for election, even if Mr. Nelson doesn't. It was... A lot of decisions, though, dealing with ballot order in cases across the country, refer to your position as a generalized political grievance, rather than an injury. Could you address that? In other words, our people don't do as well under this. Why isn't that just a generalized grievance? Well, given the evidence of the effect, it's way more than a generalized grievance. It's scientifically and statistically been established that it's a 5.88% difference. It's like the, it's like if you gave the other party a 5.88% advantage. And I think in whatever the burden is, the important part and the merits of it is that the state's interests are not served at all by the burden. If you took, if we just did what Virginia did and flipped a coin or drew lots for party, all of the state's interests would still be adequately served by that selection. And so that's the important thing. So you don't even, it doesn't matter what the standard of review is. It doesn't matter how big the burden is. Once you balance it, the plaintiffs win because the state has no interest in selecting ballot order based on a partisan discriminatory basis. The best I got from your response to Judge Thacker on Mr. Nelson here was essentially that the injury exists, even if it's on the Republican side. And in essence, what would me, how do you explain how the political party plaintiffs have standed here? Well, even the case law cited by the defendants that went, the cases that went the other way, acknowledge that when you identify specific candidates that are running, like we did, and a specific injury to those candidates, that the party has, the party has standing. For example, in this case, we had the House Democratic Leadership Committee. There will be Democrats running for the West Virginia House of Delegates that were in the last election, that were in the election before, that will be in the future, aside from whether or not Mr. Nelson runs. And Mr. Nelson, I think it's important to note, has run in two elections in a that he is. And when you keep saying in the future, and there will be that, that makes me think that sounds in mootness to me that that there's not an active controversy right now. Well, because you said the time for filing hasn't even occurred yet for the next election. And the November 2020 election about which you complain is, is over. Yeah, I'll point out, Your Honor, that we that that the plaintiffs tried very hard to have this decision go into effect before the November 2020 election. And I understand why this board stated, but at the time that the judgment was entered in the record that we have on appeal here was of a live controversy. Second point I would make is this is capable of repetition yet evading review. This is going to keep happening in West Virginia. Okay, but what about the point that Mr. Nelson, since he's the individual vehicle here for the claim, at least on as an individual plaintiff, that he is seeking to redress a past injury, isn't he? Just in the temporal context that we have here, we have only a past injury. We don't have an allegation that he will be running in the future, not in these pleadings, as I see them. So don't we just have a past injury? And how do we grant relief for a past injury? Again, I think this is the classic capable of repetition yet evading review. The record in this case was established prior to the election. We have a candidate that has indicated it has run twice, and there's no evidence that he's not going to run. And in addition, we have the party, the other political party plaintiffs, who most certainly will have elections in the future. But you know, in Alcorn, Alcorn takes a direct stab at your argument, it seems to me, because Alcorn says that ballot order does not deny the right of a political party to form or associate in a political organization. And then also says that the windfall vote theory fails to raise an inference of any cognizable constitutional burden. So how do you get us to take action in this case, when you're coming up against those two principles in Alcorn? First, that the political parties don't have any gripe, because the statute doesn't impair their right to form an association. And second, the issue is not of constitutional concern regarding windfall voting. Seems to me, Alcorn really boxes you in. I mean, I'm sympathetic to what you're saying. But in many respects, it's frustrating. But constitutionally, it seems like you're boxed in by Alcorn, aren't you? No, I don't think so. I think the Alcorn is distinguishable on the grounds that Alcorn was dealing with a situation where you're treating similar parties similarly. This is a case where you're treating similar parties differently. Excuse me, Alcorn was saying, and this is at page 708, windfall vote theory would fail to raise an inference of any cognizable constitutional burden. It didn't say with regard to, they're talking about windfall vote, and this is what you're talking about here, windfall vote, isn't it? I think I have two responses to that. First, how much that impacted the court's decision is questionable, given the fact that the court conducted the Anderson verdict analysis. Because the court said, we need to make certain that important state interests support Virginia's balloting law, order of law. They went ahead and there was enough of an injury there that they went ahead and did the entire Anderson verdict test. Second, I think the record in this case is different. Now, I realize the court said, well, we know you didn't have any discovery. But this is a case where we have a very strong record of the harms that are caused by this. And so we don't believe this court should strictly read Alcorn given that record. In the history of constitutional adjudication, lots of times cases on pleadings and things come up with, maybe that's really not a harm. But then when litigants go forth and establish the harm and establish the record, and in harms that are unchallenged in this appeal, the defendants do not challenge the Dr. Krosnick's findings and the district court's findings. So we have a record of a 5.88%. And again, I think the questions you all asked, Ms. C, are exactly the ones I would ask. If you gave the other side a 5.88% advantage, does anybody believe that would be constitutional? If you bolded the ballot, does anybody believe that would be based on party? Does anybody believe that would be constitutional? The only difference in this case is the injury itself is not completely obvious. And it took a trial and expert testimony to establish it. And well, these cases require close reading in terms of where we are, because as Judge Keenan pointed out in the beginning, we've kind of been all over the place the last 50 years or so. If you look at Alcon, and in terms of what the part of the so-called holding looks like to me, when it has the particular phrase that says that the large issue in that case is from Alcon's perspective, it was that it was politically neutral, and that it did not entrench political parties in a favorable position on the election ballot. What do we have here? So, well, it is certainly not politically neutral. The state's witnesses themselves admitted at trial that this election was on a partisan basis. Picking ballot order based on the winner of the presidential election cannot be less partisan. And that ballot order, unlike some of the prior cases in other circuits and other places, where the incumbent statutes were held unconstitutional, this is one step further to the bad for the state, because it takes one election and applies it to the members of the party up and down the ballot. And if anything, that is a stronger burden. So what if West Virginia had a system where it rotated which party's candidates had the first spot? For example, in the 2020 election, the Republican candidates had the top spot. In the 2024 election, the Democratic candidates would be, and so forth. Would that be acceptable to you? Or would that still, in your view, harm candidates' electoral process based on their party affiliation? Because that would be based on party affiliation. Well, it would be it would vary on the course of the election, but every party would have an equal chance. In any particular election, there would still be a windfall benefit that you claim is the unconstitutional burden. That's half the unconstitutional burden. The unconstitutional burden is the allocation of the windfall benefit based on a discriminatory partisan choice. So once you remove the discriminatory partisan choice, the burden... Judge Keenan is talking. Hold on. Once you say that the Democrats get the top spot or the left-hand spot on the ballot in 2024, aren't you, under the evidence you presented, automatically allocating them five plus percentage points? And why doesn't that constitute discrimination under the analysis you're offering today? Because it's not based on... Because you would weigh those burdens against the state's interests. We agree, somebody has to be first, that the idea that putting the ballot in a standard order, all of the state's interests are not invalid interests. But none of the state's goes first, made on a partisan basis. So can I go back to my question of what you want the court to do? Is it that you want the court to declare this method unconstitutional and then it goes back to the legislature or the Secretary of State to figure out a way to address it? Yes, and that is consistent with the way election cases work. When this court or another court says redistricting is unconstitutional because it violates the one man, one vote principle, the court doesn't, on the first instance, redistrict. The court sends it back to the legislative bodies to get it done. And in this case, we have plenty of time to get that done if this court rules. And we're happy with any of the choices that would permit the selection of who's first on a non-partisan, non-discriminatory, fair chance basis. And that's exactly what the court did below. So we think, I mean, all we think you need to do is affirm Judge Chambers and the legislature then gets the opportunity. Essentially, all we need to do is reinstate the exactly. Okay, anything further, Mr. Magistra? Not unless anyone else has any other questions. Okay, thank you. Ms. C? I think it's important to note the particular arguments that appellees are raising here. They're not arguing that it's inappropriate to consider partisan considerations at all because they agree that it is a fair interest for a state to have party symmetry. So there can be a choice to have all Republicans first or all Democrats first. So we have some partisan consideration. The question is whether the standard West Virginia has chosen is a constitutional way to do that. And Alcorn answers that question. And here's why. It speaks in absolute terms. It says, it does not say that it's okay to discriminate against minor parties, but not major parties. It says what mattered is that all of the parties in Alcorn were subject to the same standards. They all had the same opportunity to get into the top tier. It's unclear why there's a matter of constitutional significance to use similar standards to get into the top tier to get to the top place, especially when we're in an area that the constitution specifically entrusts in the discretion of state legislatures. Making distinctions between tiers and places is simply not something that the constitution gives a standard for or allows. And the other reason is that Alcorn speaks in absolute terms is Alcorn squarely held that an equal chance to attract the windfall vote is not a constitutional concern at all. And Alcorn made clear it wouldn't matter if we have the sort of evidence at issue in this case about precisely how much of a benefit that windfall vote is, precisely how strong it is. It's simply not a constitutional concern. And Alcorn specifically answered the question here of what happens if we have that sort of evidence. Alcorn said it's not relevant to the analysis. The other reason that Alcorn controls is because this court said that the method that Virginia chose there, which was tied to past electoral success, has the added benefit of being correlated to democratic levels of public support. And I know Judge Keenan, you asked for that citation to Alcorn in the first part of questioning, and that's at page 720 in the case. So we have a way to make the necessary decision of who is listed first. West Virginia, like 17 other states, has chosen to correlate that to past election results. This court has said that there's actually a benefit to doing that because it shows public support. It's not just state officials making that decision on their own. So Alcorn said the issue, as I asked your opponent at question there, that the issue there is politically neutral in that it did not have a negative impact on the state. And Alcorn said that there's a benefit to doing that. Here the answer is somewhat different, is it not? It's not, Your Honor, because in Alcorn, the state looked towards past electoral success to decide which parties made it into the top tier, and Alcorn was clear that they were the same standards for major and minor parties. So if, over time, the Libertarian Party increased in support, they would have the same opportunity to get into that tier. And that's what's happening here. It's the same standard for top vote in the last presidential election in West Virginia, that they have the opportunity to be in the top spot. So it's the same situation of using a neutral criteria. Every party has equal opportunity to hit that benchmark. And this is not simply a legislative official choosing someone who he or she prefers. This is not the legislature automatically making that decision of which party goes to the top. It's the legislature saying, we have to make this decision somehow. We know it's and to increase administrative efficiency in order to have party symmetry. It's helpful for voters to know where their parties are going to be in all the different races. We can't have two people in the top spot, so how are we making that choice? West Virginia tied it to a neutral, objectively verifiable metric. This is one that this court has said is appropriate because it reflects public support. There's nothing unconstitutional about that. It'd be very difficult to see how something that is not a constitutional concern at all, when we're talking about ballot tiers, suddenly become something that is so burdensome and so offensive that this court would strike down a state election law. Here we have a situation where the top tier is all that matters. I mean, when you're looking at the tiers, the Warren and Cruz case was random. Here you have a situation where the top tier is the only one that matters. And when we look at the utility of the Anderson-Burdick framework, we are in a balancing test. A balancing test of the right to vote versus the state's interest in imposing a burden on the citizen. How do you speak of it from the framework of Anderson-Burdick? Of course, Your Honor. That's because there is at most only the most minimal burden in this case. So Anderson-Burdick says we're in the most deferential territory. All the state has to do is identify important interest, and West Virginia has done that here. So what is the burden that we apply here? What is the scrutiny level? Well, this would be the most deferential standard from Anderson-Burdick. Anderson-Burdick is clear that if you have a severe burden, then strict scrutiny applies. But otherwise, as this court said in Alcorn, the court only requires the state to identify its important interest and to show that they are being served by the statute. There's no requirement the state chooses the only method available. The Supreme Court's decision in Burdick said that there is no only method requirement. This is simply not a least restrictive means test. As long as West Virginia has identified legitimate burdens, and even the district court agreed that they were important, that is enough to satisfy Anderson-Burdick. Thank you, Your Honors. All right. Thank you, Ms. C. And let me see if the other judges have questions. Judge Thacker and Judge Wynn. I have none. Thank you, Judge Kannon. Okay. Well, we would like to thank counsel. Both of you presented excellent arguments today. We're sorry we can't come and greet you in person. Hopefully, we'll be back together soon. I hope so. And the difficulty of presenting things virtually, and you both really equipped yourselves very well under the circumstances that you need to present today. So thank you so much, and we'll proceed to the next case.
judges: Barbara Milano Keenan, James A. Wynn Jr., Stephanie D. Thacker